# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| BILLIE BARNETTE, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| UNILEVER UNITED STATES INC., | |
| Defendant. | |

Plaintiff Billie Barnette ("Plaintiff"), individually and on behalf of all others similarly situated brings this class action complaint, by and through her attorneys, against Defendant Unilever United States, Inc. ("Defendant" or "Unilever") and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE CASE

1.      Plaintiff brings this action on behalf of a nationwide class and Florida subclass comprised of all purchasers of aerosol dry shampoo products manufactured and sold by Unilever under its brands: Dove, Nexxus, Suave, TIGI, and TRESemmé, that contain dangerously high levels of a known carcinogenic chemical called benzene that numerous studies have proven to be linked to various forms of cancer including leukemia ("Products").

2. Defendant manufactured the Products including the addition of benzene to them. As such, prior to placing them into the stream of commerce and consumers' households for regular use, Defendant at all times relevant hereto knew (let alone should have known) that the Products contained dangerously high levels of benzene that poses a grave threat to consumers' health and safety.

3. Despite that knowledge, however, Defendant misrepresented, omitted, and concealed the inclusion of benzene in the Products, at dangerously high levels, to consumers such as Plaintiff and Class Members by, *inter alia*, knowingly and intentionally failing to list benzene on the Products' labels or otherwise warning consumers about its presence therein.

4. Plaintiff and Class Members reasonably relied on Defendant's representations—and omissions on the Products' labels and elsewhere—that the Products were safe, unadulterated, and free of any carcinogens not listed on the label when purchasing and using the Products, thereby exposing themselves to dangerous levels of benzene.

5. By paying for the Products containing dangerous levels of benzene, Plaintiff and Class members did not receive the benefit of their bargain and, instead, received worthless Products because they contain harmful and dangerous cancer-causing benzene. Indeed, benzene is an unavoidable ingredient in the Products and their manufacturing process such that the presence of benzene renders the products

adulterated, misbranded, and illegal to sell to consumers such as Plaintiff and the Class members.

6. Because Defendant represented the Products did not contain benzene and/or failed to disclose the presence of benzene in the Products, and Plaintiff and Class Members would not have purchased the Products or would have paid less for the Products had they known the Products contained or risked containing benzene, Defendant is liable for the causes of action alleged herein. Furthermore, because the Products contain dangerous levels of benzene and Defendant failed to disclose that or list benzene on the Products labels, Defendant is liable for selling adulterated and misbranded cosmetic Products in violation of federal and state food, drug, and cosmetic statutes.

7. As a direct and proximate result of Defendant's conduct and the sale of benzene-containing Products, Plaintiff and Class members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendant's conduct.

## PARTIES

### A. Plaintiff

8. Plaintiff Billie Barnette is a resident and citizen of Yulee, Florida. Plaintiff has regularly purchased two of the Products, Dove Dry Shampoo Volume and Fullness (lot code 03130KK79) and used it 2-3 times per week off and on for the past 15 years. Plaintiff most recently purchased these two Products in or about

February 2022 at Target in Yulee, Florida, and in or about June 2021 at Target in Kingsport, Tennessee. Plaintiff has also purchased this product on many instances before that, over the course of the prior 15 years, at other Target and Wal-Mart locations.

9. It is Plaintiff's standard practice to review product labels and ingredients any time she is buying cosmetic products such as the dry shampoo Products underlying her claims. Thus, when Plaintiff purchased her Products, she reviewed the Products' labels, including the ingredients, to assess whether they were safe for her use.

10. Based on that review, it was Plaintiff's understanding that the Products were safe for their intended use, properly manufactured, and did not contain any harmful substances.

11. Plaintiff does not recall the Products' labels disclosing that they contained benzene.

12. Plaintiff relied on the representations contained in the Products' labels when deciding to purchase the Products such that Plaintiff understood them to be part of the basis of her bargain for the Products.

13. Had Defendant not made false, misleading, and/or deceptive advertisements about the safety of its products, including the Products at issue in this case, and omitted material information about the contents of the Products, including

benzene, Plaintiff would not have purchased the Products or would have paid substantially less for them.

14.     When Plaintiff purchased Defendant's Products, she did not know, and had no reason to know, that they contained cancer-causing benzene.  Not only would Plaintiff not have purchased Defendant's Products had she known they contained benzene, Plaintiff would also not have been capable of purchasing them if Defendant complied with federal and state law and abstained from illegally selling misbranded and adulterated cosmetic products.

15.     The existence of cancer-causing benzene in the Products rendered them worthless to Plaintiff. Indeed, Defendant instructed all owners of the Products to cease using them. Accordingly, Plaintiff suffered injury in fact and damages—including but not limited to out of pocket expenses paid for the Products—as a result of Defendant's deceptive and unfair conduct alleged herein.

**B.     Defendant Unilever**

16.     Defendant Unilever United States, Inc. is incorporated in Delaware and headquartered at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Unilever oversees the production, promotion, distribution, and sale of various consumer products, including the Products throughout the United States. Unilever actively engaged in the development, manufacture, distribution of the Products, which it recognizes contain dangerous levels of benzene.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members.

18.     This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise out of Defendant's contacts with this district—i.e., the sale of the Products to consumers in this district.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state.

## FACTUAL ALLEGATIONS

**A.     Benzene is a Known Dangerous, Cancer-Causing Carcinogen**

20.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[1]

21.     The United States Centers for Disease Control and Prevention ("CDC") has previously explained that "[s]ome industries use benzene to make other

---

[1]     *Benzene*, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last visited November 9, 2022).
[1] *Id.*

chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[2]

22. The FDA currently recognizes the danger of benzene and strongly advises that it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[3] Thus, where the use of benzene is avoidable, the FDA instructs that its use should be avoided.

23. In situations where the use of benzene is unavoidable, the FDA has stated that the concentration of benzene should be restricted to less than 2 parts per million ("ppm").[4] But this policy does not apply to cosmetic products such as the Products and, even if it did, the FDA nonetheless "recognizes the high danger of this compound and lists it as a 'Class 1 solvent' that 'should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity.'"[5]

---

[2] *Facts About Benzene*, CDC (last visited November 9, 2022).
[2] *Id.* https://emergency.cdc.gov/agent/benzene/basics/facts.asp. (last visited November 9, 2022).
[3] David Light et al., *Valisure Citizen Petition on Benzene in Body Spray Products* (Nov. 3, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf (the "*Valisure Citizen Petition*"). (last visited November 9, 2022).
[4] *Id.*
[5] VALISURE CITIZEN PETITION ON BENZENE IN DRY SHAMPOO PRODUCTS, at 1, https://assets-global.website-files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf. (last visited November 9, 2022).

24.    The United States Department of Health and Human Services has determined that benzene causes cancer in humans[6] and has further explained as follows:

> IARC classifies benzene as "carcinogenic to humans" based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[7]

25.    The World Health Organization and the International Agency for Research on Cancer have classified benzene as a Group 1 compound, which renders it "carcinogenic to humans,"[8] and has warned that "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[9]

26.    Like the Department of Health, the World Health Organization has also linked benzene exposure to acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[10]

27.    The CDC and the National Institute for Occupational Safety and Health

---

[6]    *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp. (last visited November 9, 2022).

[7]    *Benzene and Cancer Risk*, American Cancer Society https://www.cancer.org/cancer/cancer-causes/benzene.html. (last visited November 9, 2022).

[8]    *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/wp-content/uploads/2019/07/Classifications_by_cancer_site.pdf (last visited November 9, 2022).

[9]    https://www.who.int/teams/environment-climate-change-and-health/chemical-safety-and-health/health-impacts/chemicals/benzene. (last visited November 9, 2022).

[10] *Id*.

("NIOSH") have warned that the "target organs" for cancer associated with human exposure to benzene are "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[11]

28.     The CDC further warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[12]

29.     The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[13]

30.     "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[14] Therefore, because use of the Products involves spraying aerosol-propelled benzene directly onto consumers' bodies, it is particularly dangerous.

31.     "[E]xposure [to benzne] over a long period of time to any concentration of benzene greater than zero is not safe."[15]

---

[11]     *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last visited November 9, 2022).
[12]     *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp. (last visited November 9, 2022).
[13]     *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last visited November 9, 2022).
[14]     *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp. (last visited November 9, 2022).
[15]     F.T. Hunter, *Chronic Exposure to Benzene (Benzol): The Clinical Effects*, 21 J. Indus. Hygiene & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388. (last visited November 9, 2022).

32.     A study on benzene similarly concluded[16]:

(a)     There is probably *no safe level* of exposure to benzene, and *all exposures* constitute some risk in a linear, if not supralinear, and additive fashion.

(b)     Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

(c)     Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

33.     By virtue of the fact that it manufactures, markets, distributes, and sells household products to consumers, Defendant was aware (or at the very least, should have been aware) of the foregoing dangerous, cancer-causing propensities of benzene and accompanying grave safety risk it presents to consumers.

**B.     Unilever Markets and Advertises its Products as Safe**

34.     Unilever owns over 400 brands that manufacture, distribute, and sell products in approximately 190 countries.

35.     Unilever gained consumers' trust over the last 130 years and claims that 2.5 billion people use its products each day.[17]

36.     As discussed above, Unilever markets and sells dry shampoo products as part of its Dove, Nexxus, Suave, Tresemme, and Bed Head products line.  Each

---

[16] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANN. REV. PUB. HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646. (last visited November 9, 2022).
[17] *2020 Full Year Results*, Unilever (dated Feb. 4, 2021), https://www.unilever.com/Images/ir-q4-2020- full-announcement_tcm244-558959_en.pdf (last visited November 9, 2022).

Product is marketed, distributed, and sold in the same or similar manner in that (i) each is a dry shampoo, (ii) Defendant misrepresents or fails to disclose the presence of benzene (or the risk of the Product containing the same) on the labeling and advertising for each Product, and (iii) Unilever makes similar representations regarding the quality and safety of the Products.

37.     For instance:

(a) Unilever markets, advertises, and represents to consumers that Dove "want[s] to give you products you can trust" and that it "care[s] about how we make our products and what goes into them."[18]

(b) Similarly, Unilever markets, advertises, and represents to consumers that to "find out what is in Nexxus products," they need not do anything more than simply "check the product label for details or check the ingredients tab on the individual product pages."[19]

(c) Unilever markets, advertises, and represents to consumers that Sauve "has provided high-quality, value products that work as well as premium brands."[20]

---

[18] https://www.dove.com/us/en/stories/about-dove.html (last visited November 9, 2022).
[19] https://www.nexxus.com/us/en/faq/. (last visited November 9, 2022).
[20] https://www.unileverusa.com/brands/beauty-personal-care/suave/ (last visited November 9, 2022).

(d) Unilever markets, advertises, and represents to consumers that "TRESemmé products use only the highest quality ingredients to create safe, science-backed, professional-quality formulas to give you salon quality hair at home."[21]

## C. Contrary to its Statements Assuring Consumers that its Products are Safe, Defendant Reveals that its Products Contain Dangerous Levels of Cancer-Causing Benzene

38.    Contrary to its advertising statements to consumers that its products were safe, in October 2022, Unilever announced that "select lot codes of dry shampoo aerosol products produced prior to October 2021 from Dove, Nexxus, Suave, TIGI (Rockaholic and Bed Head), and TRESemmé" were being recalled "due to potentially elevated levels of benzene." In fact, the risk to consumers was so severe that Unilever instructed consumers to "stop using the affected aerosol dry shampoo products."[22]

39.    The Products that Defendant identified as containing dangerous levels of the known carcinogen, benzene—and that, in turn, form the basis of Plaintiff's and Class members' claims in this litigation—are as follows:

(a)    Bed Head Oh Bee Hive Dry Shampoo

(b)    Bed Head Oh Bee Hive Volumizing Dry Shampoo

---

[21]    https://www.tresemme.com/us/en/about-us/facts-on-tresemme-product-ingredient-safety.html. (last visited November 9, 2022).
[22]    https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues- voluntary-us-recall-select-dry-shampoos-due-potential-presence-benzene. (last visited November 9, 2022).

(c)　Bed Head Dirty Secret Dry Shampoo

(d)　Bed Head Rockaholic Dirty Secret Dry Shampoo

(e)　Dove Dry Shampoo Volume and Fullness

(f)　Dove Dry Shampoo Fresh Coconut

(g)　Dove Dry Shampoo Fresh and Floral

(h)　Dove Dry Shampoo Ultra Clean

(i)　Dove Dry Shampoo Invisible

(j)　Dove Dry Shampoo Detox and Purify

(k)　Dove Dry Shampoo Clarifying Charcoal

(l)　Dove Dry Shampoo Go Active

(m)　Nexxus Dry Shampoo Refreshing Mist

(n)　Nexxus Inergy Foam Shampoo

(o)　Suave Dry Shampoo Hair Refresher

(p)　Suave Professionals Dry Shampoo Refresh and Revive

(q)　TRESemmé Dry Shampoo Volumizing

(r)　TRESemmé Dry Shampoo Fresh and Clean

(s)　TRESemmé Pro Pure Dry Shampoo

40.　　Prior to this incident, Unilever experienced benzene in its product—and was thus aware of the risk of benzene infiltrating its products and the risks inherent wit same—because in November 2021, Valisure, an

independent pharmacy and laboratory registered with the FDA, detected elevated and unacceptable levels of benzene in Unilever's Suave-brand antiperspirant products.[23] That discovery prompted Unilever to recall certain antiperspirant products due to benzene in March 2022.[24]

41.     Because benzene is not an ingredient required for manufacturing or packaging dry shampoos, its presence in the Products is not unavoidable and "any significant detection of benzene could be deemed unacceptable."[25] Instead, "[t]he presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling."[26]

42.     At no time in its advertisements or marketing of the Products did Defendant disclose that the Products contained benzene and no amount thereof is acceptable in dry shampoo products, which renders the Products misbranded and adulterated, as defined by federal and state law.

43.     The Products' labels—including the ingredients portion—

_____

[23] VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, at 12-13, https://assets-
    global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure
    %20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf    (last
    visited November 9, 2022).
[24]      https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-
issues-    voluntary-nationwide-recall-suave-24-hour-protection-aerosol-antiperspirant-
powder. (last visited November 9, 2022).
[25] VALISURE CITIZEN PETITION ON BENZENE IN DRY SHAMPOO PRODUCTS, at 2.
[26] *Id*.

nowhere disclose that they contain benzene. For example, below is a picture of Defendant's label for the dry shampoo Product purchased by Plaintiff, which clearly fails to list benzene as an ingredient or otherwise disclose that the Product contains benzene:



44.     Defendant's recall of the Products wholly fails to remedy the risk to, and loss suffered by, consumers because (1) it only recalls products within certain lots and purchased before October 21 such that if products sold after that date or in different lots contain benzene, they are still being used by consumers and on store shelves; (2) consumers must provide proof of purchase to receive a refund, which is unlikely for such routine consumer cosmetic products; (3) Defendant failed to

adequately advertise the recall and inform consumers of its terms; (4) Defendant failed to disclose how widespread the benzene contamination is and the levels (in ppm) detected in the Products.

## D. Defendant's Admission that its Products Contain Benzene Renders the Products Adulterated, Misbranded, and Illegal to Sell

45. The FDA issued numerous regulations governing the manufacture and marketing of all cosmetic products, including safety data on its ingredients, one of which is the Federal Food, Drug, and Cosmetic Act ("FFDCA").[27]

46. Dry shampoo products—such as the Products at issue in this litigation—are "cosmetic" products under the FFDCA.[28]

47. The FFDCA deems the Products as "adulterated" if they "bear[] or contain[] any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling … or under such conditions of use as are customary or usual." 21 U.S.C. § 361(a). Similarly, the FFDCA deems the Products as "adulterated" "[i]f it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. §§ 361(c).

---

[27] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over- cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).
[28] VALISURE CITIZEN PETITION ON BENZENE IN DRY SHAMPOO PRODUCTS, at 1.

48. Because the Products contain benzene, a known cancer-causing and dangerous carcinogen, they are within the FFDCA's definition of "adulterated."

49. The Products are deemed "misbranded" under the FFDCA if "its labeling is false or misleading in any particular," and if its packaging does not bear "a label containing … an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count." 21 U.S.C. §§ 362(a)-(b)(2).

50. Because the Products' labels fail to disclose benzene as an ingredient or contained therein, they are "misbranded" as defined by the FFDCA.

51. Federal law prohibits the sale of any cosmetic product that is adulterated or misbranded, and renders such products illegal to sell. 21 U.S.C. § 331(a). Because the FDA prohibits the sale of adulterated and misbranded product, they are worthless and have no value.

52. Similarly, the Florida Drug and Cosmetic Act ("FDCA") defines an "adulterated" cosmetic product as follows:

> A cosmetic is adulterated:
>   (1)   If it bears or contains any poisonous or deleterious substance that is injurious to users under the conditions of use prescribed in the labeling or advertisement thereof or under such conditions of use as are customary or usual; …

§499.008, Fla. Stat. (2022). The FDCA defines a "misbranded" cosmetic as follows:

>  A cosmetic is misbranded:
>   (1)   If its labeling is false or misleading in any particular …
>       (c) A declaration of ingredients in descending order of predominance, or as otherwise required by federal law ….

(3)   If any word, statement, or other information required by or under authority of this part to appear on the label or labeling is not prominently placed thereon with such conspicuousness as compared with other words, statements, designs, or devices in the labeling, and in such terms, as to render the word, statement, or other information likely to be read and understood by an individual under customary conditions of purchase and use.

(4)   If its container is so made, formed, or filled as to be misleading.

§499.009, Fla. Stat. (2022). The FDCA strictly prohibits the manufacture, distribution, and sale of such "adulterated" and "misbranded" cosmetics:

It is unlawful for a person to perform or cause the performance of any of the following acts in this state:

(1)   The manufacture, repackaging, sale, delivery, or holding or offering for sale of any drug, device, or cosmetic that is adulterated or misbranded or has otherwise been rendered unfit for human or animal use.

(2)   The adulteration or misbranding of any drug, device, or cosmetic.

(3)   The receipt of any drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery of such drug, device, or cosmetic, for pay or otherwise.

(4)   The sale, distribution, purchase, trade, holding, or offering of any drug, device, or cosmetic in violation of this part.

(5)   The dissemination of any false or misleading advertisement of a drug, device, or cosmetic.

§499.005, Fla. Stat. (2022).

53.    As with the FFDCA, because the Products contain benzene, a known cancer-causing and dangerous carcinogen, they are within the FDCA's definition of "adulterated," and because the Products' labels fail to disclose benzene as an ingredient or contained therein, they are "misbranded" as defined by the FDCA.

54.    Furthermore, upon information and belief, Defendant's Products

contain levels of benzene above 2 ppm. Furthermore, Defendant could have altered its manufacturing and/or packaging processes to avoid the existence of benzene in the Products, and could have instituted sufficient processes to test the Products for benzene prior to selling them to consumers. The presence of benzene in the Products confirms that Defendant failed to do so and renders the Products worthless and illegal to sell.

55.     As alleged herein, Defendant has violated the FFDCA, the FDCA, the Florida Deceptive Unfair Trade Practices Act ("FDUTPA"), and is liable for negligence, negligence *per se,* negligent misrepresentation, unjust enrichment, fraudulent concealment, and strict liability by selling adulterated and misbranded Products that are illegal to sell and therefore worthless, and engaged in deceptive practices by committing misrepresentations and omissions surrounding benzene contamination affecting the Products.

56.     Had Defendant disclosed to Plaintiff and Class members that the Products contained benzene, Plaintiff and Class members would not have purchased the Products or would have paid substantially less for them.

57.     At all times relevant hereto, Defendant had and has a duty—as a manufacturer, distributor, and seller of cosmetic Products—to ensure that its Products do not contain benzene. Similarly, Defendant had a duty to disclose the existence of benzene in its Products. Defendant failed to carry out both of those duties. Instead, Defendant made multiple comments giving consumers the impression that the

Products were safe.

**E.  Defendant's Statements and Omissions Misled Consumers**

58.  Defendant made a litany of statements to consumers giving them the

impression that the Products were safe, including but not limited to the following:

(a) "[t]o keep people safe, we conduct two types of consumer safety risk assessment: ingredient safety and microbiological safety. Ingredient safety assessments evaluate the potential effects an ingredient in our products could have on the body;"[29]

(b) "[t]he safety of our products is our top priority. That is why each new product innovation is evaluated systematically and scientifically by our team in the Safety and Environmental Assurance Centre (SEAC). Our scientists consider any safety risks to the consumers who use our products, to the workers who make them, and to the environment to ensure all our products are safe to use;"[30]

(c) "Before making our products available to consumers, we make health and safety our top priority;"[31]

(d) For Dove, Unilever represents it "want[s] to give you products you can trust" and that it "care[s] about how we make our products and what goes into them";[32]

(e) For Suave, Unilever represents:

  i. "All Suave formulas are safe to use and meet the highest global standards in safety and quality";[33]

  ii. "We rigorously assess all Suave products to ensure all ingredients, manufacturing and labeling comply with applicable laws and

---

[29] *Keeping people and the environment safe*, Unilever, https://www.unilever.com/planet-and-society/safety-and-environment/keeping-people-and-the-environment-safe/ (last visited Aug. 17, 2022).
[30] *Id.*
[31] *Trust in Suave*, Suave, https://www.suave.com/us/en/dmdm-hydantoin-products-information.html (last visited Nov.. 4, 2022).
[32] https://www.dove.com/us/en/stories/about-dove.html
[33] *Id*.

regulations all over the world";[34]

    iii.  "testing [is] done to ensure that consumers will get a quality product that is safe and stable for use under different temperature and humidity conditions";[35]

    iv.  "safety assessments . . . [are conducted to] make sure that we only use what is needed to provide safe and effective products";[36]

    v.  "regulatory assessment [is conducted to] ensure[] that our products, their ingredients, how they are manufactured and labeled comply with all federal and state laws";[37] and

    vi.  "we focus on one thing. Creating quality products."[38]

(f) For TRESemmé, Unilever represents "TRESemmé products use only the highest quality ingredients to create safe, science-backed, professional-quality formulas to give you salon quality hair at home."[39]

59.    Plaintiff and the Class members were exposed to one or more of these representations during the class period and relied on one or more of these representations by virtue of the fact that every one of them decided to purchase Products. In addition, although the Products were found to contain benzene, Defendant does not list benzene among the ingredients anywhere on its website, and nothing on the Products' labels otherwise insinuate, state, or warn that the Products contain benzene. Again, such misrepresentations and omissions mislead consumers regarding the safety and quality of the Products.

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *About*, Suave, https://www.suave.com/us/en/about.html (Aug. 18, 2022).
[39] https://www.tresemme.com/us/en/about-us/facts-on-tresemme-product-ingredient-safety.html.

60.    Defendant knew that the foregoing statements were false and misleading—and omitted material information—because it knew that the Products contain dangerous levels of benzene, a dangerous carcinogen. Thus, Defendant also knowingly made the foregoing statements and assurances regarding the safety and quality of its Products without disclosing to consumers that its Products contain elevated levels of cancer-causing benzene, which further misled Plaintiff and Class members.

61.    Specifically, Defendant had general industry knowledge that its Products were at risk of, and therefore likely contained, benzene contamination because aerosols such as the Products contain use hydrocarbons such as butane or isobutane as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

62.    Because the chemicals are derived from the same sources in the same manufacturing facilities, there is high potential for benzene contamination in the processing of butane, which is why manufacturing companies that work with butane understand the risks of benzene contamination.[40]

63.    Defendant is one such company, such that it knew or should have

---

[40] *See, e.g.*, *Butane Safety Data Sheet*, Whiting, https://whiting.com/wp-content/uploads/Butane-SDS.pdf (last updated Oct. 30, 2013) ("MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS.").

known of the risks of benzene contamination in its aerosol Products.

64.     Federal and state regulatory regimes—including the FDCA and FFDCA—require that labeling for cosmetic products identify each ingredient. 21 U.S.C. § 362(b). But Defendant failed to list benzene on the Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products, even though Unilever instructed consumers to "check the product label for details or check the ingredients tab on the individual product pages" if they want to find out what is in its Products.[41]

65.     Defendant doubled-down on its false and deceptive statements and omissions by posting a statement on its website assuring customers that it does not add benzene to its products and has "strict quality controls in place" to ensure that its Products contain "safe[] levels" of benzene[42]:

> Benzene is not an ingredient that we add to our products. Any benzene detected in the final product usually occurs because of its natural presence in certain raw materials. We have strict quality controls in place that limit the presence of benzene in our deodorant, skincare and haircare products and require that any traces found fall within defined safety levels. All of our products are rigorously assessed by our safety scientists and meet the highest global standards in quality and safety as well as applicable laws and regulations, so that you can have complete trust in Suave.

66.     Contrary to this statement, however, Defendant does not have "strict

---

[41] https://www.nexxus.com/us/en/faq/.
[42]     https://www.suave.com/us/en/dmdm-hydantoin-products-information.html.     (last     visited November 9, 2022).

quality controls in place that limit the presence of benzene in our … haircare products require that any traces found fall within defined safety levels" because the Products contain multiples of the maximum amount of benzene annunciated by the FDA. Indeed, if the foregoing statement were true and Defendant had "strict quality controls in place that limit the presence of benzene" in its Products, it would not be the case that Defendant issued multiple recalls over the past year for benzene in its Products. Instead, its purported "strict quality controls" would have detected benzene and prevented those serial recalls. Likewise, if Defendant had a process in place for detecting benzene and preventing it in its products, a citizen's petition would not have uncovered that Unilever's antiperspirant products—like the Products—also contain unsafe levels of benzene.

67. In that regard, Defendant's advertising campaigns are false and misleading. Plaintiff and Class members would not have purchased the Products had they been truthfully and accurately labeled. Further, the presence of benzene in the Products renders them misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce.

68. Defendant's concealment of benzene contamination in the Products was material because consumers would have considered the inclusion of a carcinogen when deciding to purchase the Products.

69. Consumers lack the ability to test or independently ascertain or verify

whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to report truthfully and honestly what the Products contain on the Products' packaging or labels.

70.    Plaintiff and Class members trusted and reasonably relied upon Defendant's representations that its Products were safe based upon Unilever's size and history of selling consumer goods.

71.    Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the Product are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and Class Members.

72.    Based upon Defendant's statements that its Products were safe—and omitted that they contain benzene—Plaintiff and Class members paid for, and expected to receive, Products free of benzene. Because Plaintiff and Class members received Products containing benzene, they did not receive the benefit of their bargain and, instead, received worthless Products that were misbranded and adulterated such that they were illegally sold. Thus, Plaintiff was injured in the amount of the full purchase price of the Products, or Plaintiff would have paid substantially less than the full purchase price had they known they contain benzene.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

73.    Any applicable statutes of limitation have been tolled by Defendant's

knowing and active concealment of the existence of benzene in Products as well as the omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class members were deceived regarding the existence of benzene in Products and could not reasonably discover it or Defendant's deception with respect thereto.

74.     At all times, Defendant was and is under a continuous duty to disclose to Plaintiff and Class members the true standard, quality, character, nature and grade of the Products and to disclose the existence of benzene therein. Instead, Defendant omitted disclosure of the presence of benzene in the Products. Defendant actively concealed the true standard, quality, character, nature and grade of the Products and omitted material information about the quality, reliability, and characteristics of the Products. Plaintiff and Class members reasonably relied on Defendant's knowledge and concealment of the facts alleged herein.

75.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment; further, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and the following proposed classes:

**Nationwide Class**: All persons who purchased one or more of Defendant's Products in the United States for personal or household use within any applicable limitations period

**Florida Subclass**: All persons who purchased one or more of Defendant's Products in Florida for personal or household use within any applicable limitations period

77.     Together, the Nationwide Class and the Florida Subclass shall be collectively referred to herein as the "Class." Excluded from the Class are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Products for purposes of resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

78.     Numerosity:  The Class is so numerous that joinder of all members is impracticable.  While the exact number and identities of individual members of the Class are unknown at this time, such information being in the possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes that the Class consists of hundreds of thousands, if not millions, of persons and entities that were deceived by Defendant's conduct.

79.     Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common factual and legal questions include, but are not limited to:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant designed, advertised, marketed, distributed, sold, or otherwise placed the Products into the stream of commerce in the United States;

c. Whether Defendant knew about, and failed to disclose, the existence of benzene in the Products at the time Plaintiff and the Class members purchased their Products;

d. Whether Defendant designed, manufactured, marketed, and distributed the Products knowing that benzene was included, or could be included, therein;

e. Whether Defendant's conduct violates consumer protection statutes as asserted herein;

f. Whether Defendant's conduct renders it liable for negligence, negligence *per se*, negligent misrepresentation, strict liability, fraudulent concealment, and/or unjust enrichment;

g. Whether Defendant owed a duty to warn Plaintiff and Class Members about the existence of benzene in the Products;

h. Whether Plaintiff and the other Class members overpaid for their Products;

i. Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

j. Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

80. <u>Typicality</u>: All of Plaintiff's claims are typical of the claims of the Class because each Product was advertised with the same type of false and/or misleading statements, regardless of brand or type. Plaintiff and the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiff is advancing the same claims

and legal theories on behalf of herself and all absent Class Members.

81. <u>Adequacy</u>: Plaintiff is an adequate Class representative because her interests do not materially or irreconcilably conflict with the interests of the Class that she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and she intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

82. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and

notified based on, *inter alia*, Defendant's records and databases.

83.     Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**NEGLIGENCE**
(on behalf of the Nationwide Class or, alternatively, the Florida Subclass)

84.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

85.     Defendant owed duties to Plaintiff and Class members, as purchasers of Defendant's Products, to use reasonable care to ensure that the Products did not contain dangerous, harmful, or otherwise injurious substances such as cancer-causing benzene.

86.     Defendants breached their duties to Plaintiff and Class members by selling them Products containing cancer-causing benzene.

87.     Thus, Defendants failed to use reasonable care in manufacturing, packaging, distributing, and/or selling the Products to Plaintiff and Class members, and to ensure that they did not contain harmful substances such as cancer-causing benzene.

88.     Plaintiff and Class members justifiably relied upon the information supplied and representations made by Defendant, and, as a result, engaged in business with Defendants and lost money.

89.     But for Defendant's negligent conduct alleged herein, Plaintiff and Class members would not have purchased and used the Products containing dangerous levels of benzene.

90.     As a direct and proximate result of Defendants' negligence, Plaintiff and the Class were damaged in an amount to be proven at trial.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**
(on behalf of the Nationwide Class or, alternatively, the Florida Subclass)

91.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

92.     Defendant had a duty to provide honest and accurate information to its customers—such as Plaintiff and Class members—so that customers could make informed decisions on their purchase of Defendant's Products.

93.     Defendant specifically and expressly misrepresented material facts to Plaintiff and Class members, as alleged above, by making numerous statements to consumers in its advertisements that its Products were safe and failing to disclose the existence of benzene in its Products.

94.     Defendant knew, or in the exercise of reasonable diligence, should have

known, that the ordinary and reasonable consumer would be misled by Defendant's misleading and deceptive advertisements about the safety of its Products and Defendant's failure to disclose the existence of benzene in its Products.

95.     Plaintiff and the Class members justifiably relied on Defendant's misrepresentations by purchasing the Products.

96.     As a direct and proximate result of Defendant's conduct—namely, its misleading statements that its Products were safe and failure to disclose that they contain cancer-causing benzene—Plaintiff and Class members have suffered, and will continue to suffer, injury in fact, harm, and damages in an amount to be determined at trial.

## COUNT III
### NEGLIGENCE *PER SE*
(on behalf of the Nationwide Class or, alternatively, the Florida Subclass)

97.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

98.     Defendant's duties arise from the FFDCA, which prohibits "the introduction or delivery for introduction into interstate commerce of any … cosmetic that is adulterated or misbranded," such as Defendant's Products. 21 U.S. Code § 331(a). Thus, as cosmetics products regulated by the FDA, the Products are deemed adulterated if they "bear[] or contain[] any poisonous or deleterious substance which may render it injurious to users under the conditions of use

prescribed in the labeling … or under such conditions of use as are customary or usual." 21 U.S.C. § 361(a).

99.    Similarly, a cosmetic product is also adulterated "[i]f it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 361(c).

100.    A cosmetic product is misbranded if "its labeling is false or misleading in any particular," and if its packaging does not bear "a label containing … an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count." 21 U.S.C. §§ 362(a)-(b)(2).

101.    Federal law prohibits the sale of any cosmetic product that is adulterated or misbranded, and renders such products illegal to sell.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

102.    Defendant's duties further arise from the Florida Drug and Cosmetic Act ("FDCA"), which similarly strictly prohibits the manufacture, distribution, and sale of such "adulterated" and "misbranded" cosmetics:

It is unlawful for a person to perform or cause the performance of any of the following acts in this state:
  (1)  The manufacture, repackaging, sale, delivery, or holding or offering for sale of any … cosmetic that is adulterated or misbranded or has otherwise been rendered unfit for human or animal use.

(2)    The adulteration or misbranding of any … cosmetic.

(3)    The receipt of any … cosmetic that is adulterated or misbranded, and the delivery or proffered delivery of such … cosmetic, for pay or otherwise.

(4)    The sale, distribution, purchase, trade, holding, or offering of any … cosmetic in violation of this part.

(5)    The dissemination of any false or misleading advertisement of a … cosmetic.

§499.005, Fla. Stat. (2022).

103.   By manufacturing, marketing, advertising, distributing, and/or selling the cosmetic Products into the stream of commerce and to consumers—such as Plaintiff and the Class members—Defendant's business is governed by the FFDCA and FDCA such that Defendant is obligated to comply therewith. Thus, at all times relevant hereto, Defendant had a duty to comply with the FFDCA and FDCA and to abstain from injecting adulterated and misbranded cosmetic products, such as the Products, into the stream of commerce.

104.   Defendant violated its duties under the FFDCA and FDCA by, *inter alia*: (1) misrepresenting that the Products were safe to consumers; (2) failing to disclose that the Products contain benzene, including in its advertisements and product labels, thereby rendering them misbranded, (3) selling adulterated cosmetic Products containing benzene; (4) selling Products containing poisonous or deleterious substances such as cancer-causing benzene that is injurious to users; (5) failing to warn consumers of the dangerous propensities of benzene and/or that its

Products contain benzene; (6) selling Products that have been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; and/or (7) selling the cosmetic Products that are adulterated or misbranded or has otherwise been rendered unfit for human or animal use.

105.   Plaintiff and Class members—as purchasers of cosmetic products—are within the class of people the FFDCA and FDCA were intended to protect.

106.   The harm suffered by Plaintiff and Class members—as purchasers of cosmetic products—is the precise type of harm that the FFDCA and FDCA were intended to guard against and prevent.

107.   It was reasonably foreseeable to Defendant that its failure to institute sufficient safeguards and take active measures to prevent benzene from entering its cosmetic Products would result in the sale of misbranded and adulterated products to Plaintiff and Class members, which, in turn, would cause them to suffer immense injury, harm, and damages.

108.   The injury and harm that Plaintiff and Class members suffered was a direct and proximate result of Defendant's sale of adulterated and misbranded cosmetic Products containing cancer-causing benzene to them. Plaintiff and Class members have suffered, and will continue to suffer, injury in fact and harm as a result of Defendant's conduct.

<u>**COUNT IV**</u>
**STRICT LIABILITY**
(on behalf of the Nationwide Class or, alternatively, the Florida Subclass)

109.   Plaintiff re-alleges and incorporates herein all other allegations in this Complaint.

110.   Defendants designed, manufactured, and/or supplied the Products in question within the ordinary course of its business.

111.   Plaintiff purchased the Products.

112.   The Products contain cancer-causing benzene which renders them unsafe for consumer use and likely to cause grave bodily harm including cancer and are therefore unsafe and worth less than if they did not contain benzene.

113.   Defendant knew or should have known of the dangerous and defective nature of the Products at the time of their design, manufacture, sale, testing, transportation, distribution, supply, and use.

114.   Notwithstanding, Defendant failed to take safety precautions to prevent economic injury to Plaintiff and failed to warn and/or instruct Plaintiff and Class members of the defective and unreasonably dangerous nature of the Products.

115.   Defendant's defective and unreasonably dangerous Products directly and proximately caused economic injuries to Plaintiff and the Class.

116.   Plaintiff and Class members used the Products in a manner of use reasonably anticipated by Defendant.

117. As a result of the Products containing cancer-causing benzene, they are unreasonably dangerous and defective when put to the use anticipated by Defendant.

118. As a direct and proximate result of the dangerous and defective condition of Defendant's Products and failure to warn of the dangers thereof, Plaintiff and the Class have suffered economic injuries.

119. At the time of Defendant's design, manufacture, processing, distribution, marketing, selling, supplying and/or use of the Products at issue, Defendant knew of the dangerous condition of said Products and supplied them with deliberate and/or intentional disregard for not making any warning, instruction, or other precaution to prevent injuries or damages and thereby showed complete indifference to and/or conscious disregard for the rights and/or safety of others.

120. Defendants specifically placed profits ahead of the health, rights, and safety of others by intentionally selling the Products even though they contain cancer-causing benzene and by concealing material facts about the Products.

121. Defendants' conduct was willful, wanton, and/or in reckless disregard for the safety and rights of Plaintiff and the Class.

## COUNT V
## FRAUDULENT CONCEALMENT
(on behalf of the Nationwide Class or, alternatively, the Florida Subclass)

122. Plaintiff incorporates by reference the allegations of all foregoing paragraphs as if they had been set forth in full herein.

123. At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

124. Defendant sold the Products throughout the United States.

125. Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products, including that they contained cancer-causing benzene.

126. Rather than inform consumers of the truth regarding the Products and benzene contained therein, Defendant concealed that material information from Plaintiff and the Class members.

127. Defendant's omissions were material because the presence of benzene in the Products has a substantial impact not simply on the convenience and cost of Products, but also on the health hazards and overall usability of the Products.

128. Defendant omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Products, or would have paid substantially less for them, had they known the truth.

129. Plaintiff and the Class members had no way of knowing about the benzene in the Products.

130. Plaintiff and Class members could not have discovered the above information on their own, because Defendant was in the exclusive possession of such information.

131. Although Defendant has a duty to ensure the accuracy of information regarding the Products and any harmful substances contained therein, it did not fulfill these duties.

132. Plaintiff and Class members sustained injury due to the purchase of Products containing benzene.

133. Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's Products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT VI
## UNJUST ENRICHMENT
(on behalf of the Nationwide Class or, alternatively, the Florida Subclass)

134. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135. Plaintiff brings this Count on behalf of herself and the Class against Defendant.

136. Defendant's conduct violated, *inter alia*, state and federal law, by manufacturing, advertising, marketing, and selling the Products that were

adulterated, misbranded, and thus illegally sold, and while misrepresenting and omitting material facts.

137.  Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

138.  Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

<u>COUNT VII</u>
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat. §§ 501.201,** *et seq.*
(on behalf of the Florida Subclass)

139.  Plaintiff and the Florida Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

140.  Plaintiff brings this claim on behalf of herself and on behalf of the Florida Subclass against Defendant.

141.  The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  Defendant engaged in unfair and deceptive practices that

violated the FDUTPA as described above.

142. Defendant engaged in "trade or commerce" in Florida within the meaning of the FDUTPA by selling Products in Florida and to Florida residents. *See* Fla. Stat. § 501.203(8).

143. Defendant caused to be made or disseminated through Florida and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff and the other Florida Subclass members and otherwise engaged in activities with a tendency or capacity to deceive, as alleged herein.

144. In violation of the FDUTPA, Defendant employed unfair and deceptive acts or practices, fraud, false pretense, misrepresentation, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of its Products containing benzene. Defendant knowingly concealed, suppressed and omitted materials facts regarding the existence of benzene in the Products and misrepresented the standard, quality, or grade of the Products, which directly caused harm to Plaintiff and the Florida Subclass.

145. Defendant actively suppressed the fact that its Products contain the

benzene because of materials, workmanship, design, and/or manufacturing shortfalls conducted by Defendant. Further, Defendant employed unfair and deceptive trade practices by failing to detect and prevent benzene from infiltrating its Products within a reasonable time in violation of the FDUTPA.

146. Defendant also actively suppressed and failed to disclose benzene on the Products labels and sold adulterated and misbranded cosmetics in violation of the FDCA as alleged herein, the violation of which constitutes a violation of FDUTPA.

147. As alleged above, Defendant has known of the existence of benzene in its Products and dangerous, cancer-causing propensities of benzene for years. Prior to selling the Products, Defendant knew or should have known they contained benzene due to pre-production testing, quality control audits/investigations, and other pre-sale manufacturing/design assessments, including but not limited to the "strict quality control processes" that Defendant touted to consumers. Defendant nevertheless failed to disclose and actively concealed the existence of benzene in the Products.

148. Defendant's unfair and deceptive trade practices were likely intended to deceive a reasonable consumer. Plaintiff and Florida Subclass members had no reasonable way to know that the Products contained benzene or were defective in workmanship, design, and/or manufacture. Defendant possessed superior

knowledge as to the quality and characteristics of the Products, including the benzene within its Products, and any reasonable consumer would have relied on Defendant's misrepresentations and omissions, as Plaintiff and Florida Subclass members did.

149. Defendant intentionally and knowingly misrepresented material facts and omitted material facts regarding the Products with an intent to mislead Plaintiff and the Florida Subclass members.

150. Defendant knew or should have known that their conduct violated the FDUTPA.

151. Defendant owed Plaintiff and the Florida Subclass members a duty to disclose the true nature and character of the Products and the existence of benzene therein because Defendant:

a. Possessed exclusive knowledge of the benzene;

b. Intentionally concealed the foregoing from Plaintiff and the Florida Subclass;

c. Represented that goods had sponsorship, approval, characteristics, uses, and benefits that they do not have;

d. Provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data, and other information to consumers regarding the performance, reliability, quality, and nature of the Products;

e. Represented that goods or services were of a particular standard, quality, or grade, when they were of another;

f. Engaged in unconscionable commercial practices in failing to reveal

material facts and information about the Products, which did, or tended to, mislead Plaintiff and Florida Subclass members about facts that could not reasonably be known by the consumer;

g. Failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

h. Caused Plaintiff and Florida Subclass members to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

i. Failed to reveal material facts to Plaintiff and Florida Subclass members with the intent that they would rely upon the omission; and

j. Made material representations and statements of fact to Plaintiff and Florida Subclass members that resulted in them reasonably believing the represented or suggested state of affairs to be other than what they actually were.

152.   Plaintiff and Florida Subclass members have suffered an injury in fact, including the loss of money or property, as a result of Defendant's unfair, unlawful, and/or deceptive practices. In purchasing their Products, Plaintiff and Florida Subclass members relied on the misrepresentations and/or omissions of Defendant with respect to the ingredients therein. Defendant's representations were untrue because the Products contain an additional ingredient that Defendnat intentionally omitted from its Products' labels: cancer-causing benzene. Had Plaintiff and Florida Subclass members known this, they would not have purchased their Products and/or paid as much for them. Accordingly, Plaintiff and Florida Subclass members overpaid for their Products and did not receive the benefit of their bargain.

153.   All of the wrongful conduct alleged herein occurred, and continues to

occur, in the conduct of Defendant's businesses. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of Florida and nationwide.

154. Plaintiff, individually and on behalf of the Florida Subclass members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to provide declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for relief and judgment against Defendant as follows:

(a) Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as the representative of the Classes, and designating Plaintiff's counsel as Class Counsel to represent the Classes;

(b) Awarding Plaintiff and Class Members compensatory damages, in an amount to be determined at trial;

(c) Awarding Plaintiff and Class Members appropriate relief, including but not limited to actual damages;

(d) For restitution and disgorgement of profits;

(e) Awarding Plaintiff and Class Members reasonable attorneys' fees and costs

as allowable by law;

(f)  Awarding pre-judgment and post-judgment interest;

(g) For punitive damages; and

(h) Granting any other relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: November 9, 2022          Respectfully submitted,

By: _/s/ Mark B. DeSanto_____
      Mark B. DeSanto (Fla. Bar No. 107688)
      Joseph G. Sauder (*pro hac vice* forthcoming)
      **SAUDER SCHELKOPF**
      1109 Lancaster Avenue
      Berwyn, PA 19312
      Telephone: (888) 711-9975
      Facsimile: (610) 421-1326
      jgs@sstriallawyers.com
      mbd@sstriallawyers.com

      *Attorneys for Plaintiff*